Diana McFaddin Houk et al. [1] v. Commissioner. Diana McFaddin v. Commissioner
Docket Nos. 8371-8378 and 9055.
United States Tax Court
1947 Tax Ct. Memo LEXIS 168; 6 T.C.M. (CCH) 761; T.C.M. (RIA) 47180; June 25, 1947
Percy W. Phillips, Esq., 306 Southern Bldg., Washington 5, D.C., for the petitioners. D. Louis Bergeron, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The respondent determined deficiencies in income taxes of petitioners for the calendar years 1940 and 1941, as follows: Petitioner
1940
1941
Diana McFaddin Houk
$ 69.94
$1,445.11
Camelia Blanchette McFaddin
275.06
Amizetta Northcott McFaddin
1,577.01
Mamie McFaddin Ward
718.38
3,190.97
C. E. Ward
1,161.97
W. P. H. McFaddin, Jr.
606.18
2,587.41
Rosine Blount McFaddin
1,583.61
James Lewis Caldwell McFaddin
418.31
2,726.00
Estate of Mrs. Skipwith M. Duncan
1,506.38
In Docket No. 9055, the respondent also determined that the Estate of Mrs. Skipwith M. Duncan was *169 liable for an addition to tax in the amount of $376.60 for failure to file a return for the year 1941. By stipulation of the parties the issues to be decided have been reduced to the following: (1) In computing the net income of the McFaddin Trust for the fiscal year ending February 28, 1941, distributable to petitioners as beneficiaries or spouses of beneficiaries, is the trust entitled to a deduction for a bad debt recoverable only in part of the amount of $115,273.34, or any other amount? (2) Is the Estate of Mrs. Skipwith M. Duncan liable for an addition to tax in the amount of $376.60 for failure to file an individual income tax return for the calendar year 1941? Findings of Fact W. P. H. McFaddin, hereinafter referred to as the decedent, was a resident of Beaumont, Texas. Prior to his death on November 5, 1935, he was a rancher and cattleman as well as the owner of considerable real estate and oil and gas properties located in various parts of Texas. At the time of his death he was over 79 years of age. He left a widow, Ida Caldwell McFaddin, and six children, Diana McFaddin, W. Valentine McFaddin, Skipwith McFaddin, Mamie McFaddin, W. P. H. McFaddin, Jr., and James *170 Lewis Caldwell McFaddin. Diana McFaddin Houk was a resident of Springfield, Missouri, and filed her income tax return for 1940 with the collector of internal revenue for the sixth district of Missouri. When she filed her return for the year 1941 with the collector of internal revenue for the first district of Texas she was a resident of Beaumont, Texas. All of the other petitioners, with the exception of Mrs. Skipwith M. Duncan, were residents of Beaumont, Texas, when they filed their returns for the taxable years with the collector of internal revenue for the first district of Texas. Mrs. Skipwith M. Duncan, a resident of Huntington, West Virginia, prior to her death on December 15, 1943, did not file a return for the calendar year 1941. On June 2, 1920, the decedent executed his last will and testament. It was filed for probate on December 5, 1935, with the Clerk of the District Court for Jefferson County, Texas, and was duly probated. James Lewis McFaddin and Ida Caldwell McFaddin were duly appointed and qualified as independent co-executors of decedent's estate. The will, after providing for a number of specific bequests and devises to decedent's widow and children, provided *171 as follows: "Eighth: That after satisfying all the foregoing bequests and devises, I give, bequeath and devise unto my said six children, share and share alike one-half of all my separate property, real, personal and mixed, and also my entire half of the community property of every kind owned by me and my wife, Ida, to have and to hold unto them, their heirs and assigns forever. "Ninth: I hereby nominate and appoint as the independent executors of this my last will, my wife, Ida Caldwell McFaddin, and my two sons, W. P. H. McFaddin and James Lewis McFaddin, and direct that no bond shall be required of them as such executors, and I hereby vest in them or such of them as may qualify as executors, full power and authority to fully administer my estate, independent of the courts of the country. "Tenth: It is my will and I so direct that all of my property other than that contained in the foregoing special bequests, be held together until all my just debts are paid, not to exceed six years in any event from my death. * * * "Eleventh: It is my will and I so direct that the County Court shall have and exercise no further jurisdiction in reference to my estate other than to probate *172 this will and cause to be returned and filed an inventory and appraisement of my estate and a list of claims thereto belonging." On March 1, 1927, decedent and his wife executed a declaration of trust wherein they transferred certain real and personal property listed therein to the decedent and his sons, James Lewis Caldwell McFaddin and W. P. H. McFaddin, Jr., as trustees, for a period of ten years. The trust instrument provided that the managing trustee should receive compensation not in excess of $30,000 per annum and the other trustees compensation not in excess of $6,000 per annum. The decedent became managing trustee, and as such he had two votes to one each for the other trustees. The trust instrument also provided that the trustees were empowered to carry on any business, venture, enterprise or undertaking on behalf of the trust estate, were to have broad powers of management, and were not personally responsible for or an account of anything done or failed to be done, except for "wilful or corrupt misconduct or breach of trust." They could transfer the assets to a corporation or corporations at their discretion. They could set up a reserve, in addition to the reserve for *173 depreciation, to discharge any and all liabilities; all funds could be invested and reinvested at their sole discretion; and, with the consent of two-thirds in number and in interest of the beneficiaries, they could continue the trust for an additional ten-year period. So long as the trust continued, the trustees were directed to pay the sum of $30,000 per year to Ida Caldwell McFaddin. This payment and other specified expenditures were to be deducted from the income of the trust in arriving at its net income, which was to be distributed to the beneficiaries, the six children of the decedent. Their shares in the trust were as follows: Diana McFaddin (Houk)
11 2/3%
Skipwith McFaddin (Duncan)
11 2/3%
W. Valentine McFaddin
11 2/3%
Mamie McFaddin (Ward)
21 2/3%
W. P. H. McFaddin, Jr.
21 2/3%
James Lewis Caldwell McFaddin
21 2/3%
The balance sheet of the trust as of the date of its creation, March 1, 1927, disclosed the following net worth: ASSETS
Real Estate
$ 802,209.89
Knox County Ranch (Land and
Building)
164,943.27
Cattle Inventory
204,240.00
Automobiles
8,253.35
Buildings
49,455.82
Rice Mill (Land, Buildings &
Equipment)
49,750.00
Miscellaneous Assets
12,280.48
Total Assets
$1,291,132.81
LIABILITIES AND NET WORTH
Notes & Mortgages Payable
$ 488,234.02
McFaddin Fur Company
5,986.71
Total Liabilities
$ 494,220.73
Net Worth
796,912.08
Total
$1,291,132.81
*174 During the fiscal year ended February 28, 1930, decedent borrowed from the McFaddin Trust $1,231,915.70, which amount, according to the Trust books, was carried as notes receivable. During the fiscal year 1930 decedent repaid $550,000 of said indebtedness to the Trust leaving a balance outstanding on February 28, 1930, of $681,915.70. Additional overdue payments were made as follows: Fiscal year 1931
$240,000.00
Fiscal year 1934
75,000.00
Fiscal year 1935
55,000.00 The credits of $75,000 and $55,000 resulted from the transfer by the decedent to the trust of real estate. At the time the decedent made this loan he was reputed to be worth from $750,000 to $1,000,000. He borrowed the money from the trust for the purpose of purchasing and fattening cattle for the market. As of February 28, 1935, the decedent was indebted to the McFaddin Trust in the principal amount of $311,915.70, evidenced by interest-bearing notes. Although the income tax returns filed by the Trust stated that its books were kept on the acrual basis, no interest on these notes was ever set up on the trust books or reported as taxable income in any returns for any taxable year by the Trust. *175 Interest owed to the Trust by others was entered on the books only when it was actually received, and interest and taxes owed by the trust were charged on the books when paid rather than when due. During the year 1933 the decedent's creditors began pressing him on their various accounts and, in order to protect the claim of the McFaddin trust against him, he executed a deed of trust on December 21, 1933 to one D. M. Anderson as trustee. The deed covered extensive real estate, title to which was then in decedent, and, in the event of the failure of decedent to pay his indebtedness to the McFaddin Trust, gave the trustee the power to sell the real estate at public auction and to convey the property sold to the purchasers in fee simple with general warranty of title. The deed recited that it was given to secure the payment of seven notes of decedent dated December 21, 1933, aggregating $307,037.49, payable three months after date and bearing interest at 6 per cent per annum, "and also to secure all other and further indebtedness, present or future, of the said W. P. H. McFaddin to the McFaddin Trust, and to secure the McFaddin Trust the payment of all indebtedness of the said W. P. *176 H. McFaddin to other parties upon which indebtedness the McFaddin Trust is also obligated and especially to the Yount-Lee Oil Company, and all extensions and renewals of the notes, indebtedness, and obligations herein described, * * *." Prior to the decedent's death in 1935, the trustees of the McFaddin Trust directed trustee Anderson to advertise the property in Jefferson County covered by the deed for sale at public auction "for the purpose of paying the indebtedness therein secured". At the sale, on June 4, 1935, one prospective purchaser offered to pay $10,000 for some oil rights on some of the land involved. The only other bidder was the McFaddin Trust and its bid of $125,000 for the property in bulk was successful. During its fiscal year ending February 28, 1936, the McFaddin Trust also foreclosed on property held by the decedent in Orange County comprising 539 acres of land. The books of the trust disclose that the property was taken over at $2,500, the foreclosure bid price. As a result of these foreclosures the decedent's account was credited with the sum of $127,500. On September 28, 1935, the McFaddin Trust instituted proceedings in the District Court of Jefferson County, *177 Texas, against decedent for deficiency judgment, and on October 14, 1935, the court entered judgment for $179,142.22 principal, $2,753.37 interest, $18,189.55 attorney's fees, or a total of $200,085.14. The decedent died on November 5, 1935. On September 3, 1936, the executors of his estate, his widow and James Lewis Caldwell McFaddin, filed an estate tax return disclosing the following: Gross Estate
A
Real Estate
$166,300.00
B
Stocks and Bonds
36,745.25
C-1
Mortgages, Notes and Cash
33,921.04
C-2
Insurance
6,636.21
D-2
Other Miscellaneous Property
4,080.00
Total Gross Estate
$247,682.50
Deductions
H
Funeral expenses
$ 3,824.80
Administration expenses (Esti-
mated)
Executors' commissions
40,000.00
Attorneys' fees
5,000.00
I
Debts of Decedent
322,676.49
J-u
Unpaid Mortgages
590,822.29
Total Deductions
$962,323.58
In addition to the total gross estate of $247,682.50 there was available for the payment of decedent's debts $228,471.29, being the value of the widow's community interest, which made the total assets subject to the payment of debts $476,153.79. The estate was not called upon to pay $275,000 of the total *178 indebtedness representing accommodation endorsements, and the estimated executor's commissions of $40,000 shown on the return were never paid. Decedent's estate tax return showed as obligations to the McFaddin Trust a judgment in the amount of $200,094.39 and a secured debt in the amount of $93,112.50. The former represents the deficiency judgment taken after the foreclosure sale. It includes interest and attorneys' fees in the amount of $90,678.69, leaving a principal obligation of $109,415.70. The debt of $93,112.50 shown on the return represents the decedent's obligation on two notes given to the McFaddin Trust at the time of the original loan in 1929 in the principal amounts of $65,000 and $10,000, respectively, plus accrued interest of $18,112.50. The McFaddin Trust had never accrued this interest on its books, but when the decedent's estate tax return was prepared the executors deemed it necessary to show the accrued interest liability as a debt of the decedent. The books of the McFaddin Trust showed the indebtedness of the decedent to the trust on his notes as of date of his death, to be $184,415.70 ($109,415.70 plus $75,000). They also showed salary due decedent from the *179 Trust in the amount of $26,000, and the sum of $18,753.01 due decedent for advances made by him to the Trust. At the time of the death of decedent foreclosure proceedings were pending in a suit filed by the Broussard Trust in February, 1935. The Broussard Trust held some second lien notes in the amount of $82,000 on certain business property owned by decedent at the time of his death and instituted foreclosure proceedings to enforce the lien. The McFaddin Trust in ervened in this suit, asserting a lien of $75,000 on part of the property superior to that of the Broussard Trust. After the decedent's death, the Broussard Trust countered with a lis pendens action contesting the validity of the McFaddin Trust lien and charging that the McFaddin Trust was a mere agency created for the purpose of holding the estate of decedent; that it was used by the decedent up to the time of his death as a depository for all of his estate, the said property being conveyed by him to the trustees of the McFaddin Trust for the purpose of delaying and defrauding his creditors; that trustees of the McFaddin Trust colluded with the executors of the will of the decedent to claim substantially all of the estate *180 of the decedent, not encumbered to the extent of its value, as part of the McFaddin Trust estate; that all the trust properties were charged with the obligation to pay the indebtedness to Broussard in the amount of $82,000; and furthermore, that the estate without the trust properties was insolvent. The controversy between the Broussard Trust, the McFaddin Trust and the estate of the decedent was settled in March, 1937. The Court entered a judgment for the Broussard Trust and against the executors, only in their capacity as executors, in the amount of $46,473. The properties involved, consisting of three buildings known as the Nathan, Szafir, and Tivoli, were deeded by the estate of the decedent to the McFaddin Trust, and the latter credited the decedent's account with $75,000, and paid $59,000 to the Broussard Trust. In August 1940, the McFaddin Trust paid the Broussard Trust $10,500 for the $46,548.20 judgment, thus removing a lien against estate property. The three buildings acquired by the McFaddin Trust in the above-mentioned foreclosure proceeding had a value of $179,000, when acquired by the estate of the decedent in 1935. During the fiscal year of the McFaddin Trust ending *181 February 28, 1941, the executors of the estate sold a piece of the estate's property for $2,100 and turned over the proceeds to the trust to apply on the decedent's debt. Following the foreclosure sale of Anderson, trustee, to the McFaddin Trust it developed that some of the land purchased by the trust was encumbered by prior liens of different kinds in the hands of various creditors. The McFaddin Trust made expenditures to extinguish these liens, and also assumed and paid certain claims against the estate of the decedent. The expenditures made were as follows: In 1936, it acquired for $497.65 a judgment which the Texas National Bank obtained in that year against Mrs. L. M. Greeves, the maker of a note, and the estate of the decedent, the decedent having been the accommodation endorser. The McFaddin Trust acquired, at a cost of $3,629.59, a judgment held by the First National Bank of Houston against decedent's estate and one T. B. Moore. The note on which this judgment was taken was secured by a deed of trust on two parcels of real estate. One of these, in the Jirou Addition to Beaumont, had already been taken over by the Trust in the foreclosure sale on June 5, 1935; and the *182 other parcel, an apartment building in the Wilmuth Addition in Houston which was appraised at $7,250, belonged to decedent's estate. The bank's lien on the Jirou property was prior to that of the Trust. On February 23, 1938, the trust acquired at a cost of $35,725.14, a judgment against decedent's estate held by the Texas National Bank. Decedent, during his lifetime, secured loans from the bank for which he executed notes in the amount of $12,500 and $5,700. In addition, he was endorser on a note executed by Wm. W. Moore in the amount of $23,544.50 and on a note executed by Wm. Moore Company in the amount of $5,574.33. On September 18, 1933, as security for the above loans and in order to get an extension thereon, decedent executed a deed of trust, conveying to the bank his undivided one-half interest in all or parts of some 24 blocks located in the McFaddin Heights Addition. The deed contained the usual first lien provisions and provided for foreclosure sale of the properties upon default of principal or interest. At the date of his death, decedent, apparently having paid the $12,500 note, was indebted to the bank in the amount of $5,700 and in the amounts of $23,544.50 and $774.32. *183 Some of the above properties were acquired by the trust in the 1935 foreclosure proceedings, but a substantial portion valued at $48,825, was still owned by decedent at the date of his death. On August 3, 1940, the trust acquired at a cost of $10,500, a judgment against decedent's estate in the face amount of $46,473 held by the Broussard Trust. As heretofore pointed out, this judgment obtained by the Broussard Trust on March 10, 1937, was a lien on all the properties of decedent's estate. On December 1, 1934, the trust acquired, at a cost of $40,000, a note in the principal amount of $35,000, bearing interest at 7 per cent per annum from December 22, 1926, executed by John H. Goodhue and others to Marrs McLean. The decedent assumed the payment of this note on May 30, 1927, and it was secured by first liens on two pieces of real estate - Lot 13 of Block 19 of the Calder Addition (Nathan Building) and parts of the James Drake Headright Survey, also known as McFaddin Heights. The Nathan Building was one of three pieces of real estate acquired by the trust in connection with the Broussard Trust settlement in 1937. Later the McFaddin Trust received a credit of $639 for one lot which *184 was sold. The decedent, on November 5, 1935, was indebted to the Management Company of Texas on a note in the amount of $7,210, secured by a first mortgage on Lot 18, block 1 of the Wilmuth Addition, Houston, Texas, as well as improvements thereon consisting of a brick duplex. Rentals received on this property in the amount of $780.51 had been applied on the indebtedness, leaving a balance of $6,429.49, which was assumed and paid by the McFaddin Trust. Decedent gave some purchase money notes to B. Dorsman, and he assigned them to the Security State Bank and Trust Company on September 22, 1930. These notes, secured by a first lien on several blocks of land in the Gold Hill Third Addition which the McFaddin Trust had acquired in 1935 by foreclosure, were purchased by the trust in 1940 for $2,500. On February 28, 1941 (the end of the McFaddin Trust's fiscal year) the value of the property remaining in the decedent's estate was $93,083.26. As of that date the following liens were outstanding against the property remaining in the estate: Real estate taxes due the City of
Beaumont
$ 2,749.39
Real estate taxes due Jefferson Coun-
ty, Texas
86.89
Note to First National Bank
23,800.00
Note to First National Bank
918.06
Accrued interest on above notes
1,999.75
Total
$29,554.09
*185 On February 28, 1941, the McFaddin Trust owed the estate of decedent $27,156.05, $26,000 of which represented salary due decedent and $1,156.05 on account payable. In its fiduciary income tax return for the fiscal year ending February 28, 1941, the McFaddin Trust claimed as a deduction "Loss on Bad Debts" in the amount of $117,373.34 due from the Estate of W. P. H. McFaddin, which was "considered uncollectible at February 28, 1941, and charged off Books". In a schedule attached to the return, the trust arrived at the amount of $117,373.34 as follows: Obligations due from estate of decedent "partially collectible by prop-
erty of Estate"
$155,729.71
Less: Interest to 12/31/31 added to notes, but not taken into
account
$34,100.96
Credits on accrued interest for property previously
received in foreclosure
12,213.05
46,314.01
$109,415.70 [2]
Judgments against Est. of W. P. H. McFaddin paid by McFaddin Trust: Cause No. 11763 - Texas National Bank v. W. P. H. McFaddin, et al.
Cost
$ 497.64
Judgment - First National Bank, Houston, v. T. B. Moore Cost
3,629.59
Judgment, Texas National Bank, v. W. P. H. McFaddin Estate, et al.
Cost
35,725.14
Judgment - Broussard Trust v. Estate of W. P. H. McFaddin, Cause
No. 45034 Cost
10,500.00
50,352.37
Notes of W. P. H. McFaddin and W. P. H. McFaddin Estate paid or
assumed by McFaddin Trust.
W. P. H. McFaddin to Marrs McLean, (Paid)
40,000.00
Less: Credit for Lot Sold
639.00
39,361.00
W. P. H. McFaddin to Management Company of Texas,
(Paid)
$ 7,210.00
Less: Credit for Rentals Received
780.51
6,429.49
Estate of W. P. H. McFaddin to Security State Bank & Trust Co.,
(Assumed)
2,500.00
48,290.49
Liens against the property of McFaddin Estate assumed by McFaddin
Trust
Taxes due City of Beaumont
2,749.39
Taxes due Jefferson County
86.89
Note to First National Bank
23,800.00
Note to First National Bank
918.06
Accrued Interest on Notes to 2/28/41
1,999.75
29,554.09
$237,612.65
Deductions: Salary Account of W. P. H. McFaddin
$ 26,000.00
Account Payable, McFaddin Trust to Estate of W. P. H. McFaddin
1,156.05
$ 27,156.05
Net Balance due Trust
$210,456.60
Less: Original appraised value of properties of W. P. H. McFaddin Estate,
taken over by McFaddin Trust, at February 28, 1941: Real Estate - Community Property
$ 45,129.36
Real Estate - Separate Property
11,750.00
Buildings (less depreciation)
6,525.00
Stocks
15,563.50
Livestock
1,107.00
Furniture & Fixtures
360.00
Notes Receivable
7,403.40
Accounts Receivable
5,245.00
Total Assets Received from Estate of W. P. H. McFaddin
$ 93,083.26
Total Loss on Account of Estate of W. P. H. McFaddin
$117,373.34 [2]
*186 The respondent disallowed the deduction of $117,373.34 claimed by the McFaddin Trust. The taxes and other liabilities of the Estate aggregating $29,554.09 were not assumed by the McFaddin Trust on or before February 28, 1941, and the trust did not take over the remaining assets of the estate, valued at $93,083.26, as of February 28, 1941. These assets were acquired by the trust when the estate was closed on December 30, 1942. The closing entries on the books of the McFaddin Trust under date of February 28, 1941, contain the following journal entry: Profit and Loss - partial loss on Estate
$115,273.34
Estate of W. P. H. McFaddin
$115,273.34
To charge off estimated probable loss on account of assets
received by trust from Estate (Original appraised value
of properties received deducted from amount due from
Estate).
Since the inception of the McFaddin Trust, it was customary for the trustees to credit to each beneficiary's *187 account his or her share of trust income for the year, but to pay to such beneficiary only such amount as the Trustees and the beneficiary might decide upon. The beneficiaries pay income tax on their distributive share of trust income for the trust's fiscal year ending in their calendar year without regard to the amounts actually received by them during a particular calendar year. Money was paid by the trust to Mrs. Skipwith McFaddin Duncan by the trust during the calendar year 1941, but this money was from income taxed to her, but not distributed, in prior years. It was the trustees' custom to advise the beneficiaries as to the results of the trust's operations during its fiscal year ending on February 28 or 29, and to advise the beneficiaries as to the amount of Trust income taxable to them. The income tax return of the trust for the fiscal year ending February 28, 1941, showed a loss of $29,358.71. Mrs. Duncan was accordingly advised by J. L. C. McFaddin, one of the trustees and an attorney-at-law, that she was not taxable on any trust income in her calendar year 1941. She had no taxable income from other sources, and did not file an income tax return for the calendar year 1941. *188 Opinion In determining the amount, if any, of the indebtedness of the estate of the decedent to the McFaddin Trust which was recoverable in part during the fiscal year of the trust ending February 28, 1941, it becomes necessary to consider briefly the various transactions referred to in our findings and their effect upon the indebtedness. The parties have stipulated that the decedent's debt amounted to $311,915.70 as of February 28, 1935, which was the end of the trust's last fiscal year prior to the date of the death of the decedent. In view of this stipulation we deem it unnecessary to give any attention to the transactions which resulted in the reduction of the indebtedness to this amount. Neither do we deem it necessary to discuss the credit of $2,100 to the decedent's account in 1940, which represented the proceeds of a sale of a lot which were turned over to the Trust by the Estate. The remaining transactions, for the purpose of discussion, will be referred to as the 1935 foreclosure, the Broussard Trust transaction, and liabilities of the estate assumed and paid by the McFaddin Trust. Only a brief reference need be made to the 1935 foreclosures at which the McFaddin Trust *189 bid in certain mortgaged property for $127,500 and credited this amount to decedent's account. The respondent urges that the evidence fails to disclose the fair market value of the properties taken over by the Trust. His regulations provide, however, that where mortgaged property is bid in at a foreclosure sale, its fair market value shall be presumed to be the amount for which it is bid in by the taxpayer in the absence of clear and convincing proof to the contrary. Art. 23 (k)-3, Reg. 86, 94, 101, 103, 111. This provision appears to us to be sound. We have no evidence that the bid price of $127,500 did not represent fair market value. The crediting of this amount to decedent's account resulted in a reduction of the principal amount of his debt to the Trust at the time of his death to $184,415.70. The Broussard Trust transaction is rather involved. It resulted from the acquisition by that trust of certain unpaid notes totaling $82,000 which the decedent had given to certain individuals as part of the purchase price of three parcels of real estate. Litigation resulting from the failure of the decedent to pay the principal and interest on these notes finally culminated in a judgment *190 of $46,473 against the executors of decedent's estate and in favor of the Broussard Trust, and the taking over of properties consisting of three buildings, the Nathan, Szafir and Tivoli, and the lots on which they stood, by the McFaddin Trust, which credited the decedent's account with $75,000 and paid the Broussard Trust, $59,000. It is not clear from the evidence whether the acquisition of the properties by the McFaddin Trust resulted from an agreement of all interested parties, or from a foreclosure sale. Witness J. L. C. McFaddin testified that the McFaddin Trust foreclosed "on the first mortgage and bought it in at that sale for the $75,000.00 shown on the schedule, together with the * * * $59,000 which we paid the Broussard Trust for their second lien." No deed securing the $75,000 note indebtedness is in evidence. Our chief concern is whether the McFaddin Trust adequately credited the account of the decedent as a result of this transaction. The value of the three buildings taken over as of the date of the death of the decedent is shown in the estate tax return filed by the executors to be $179,000. The credit of $75,000 plus the amount of $59,000 paid the Broussard Trust totals *191 $134,000. Petitioners now concede that the amount of $40,000 paid for the Marrs McLean mortgage in 1934 should be treated as a part of the cost of the Nathan Building. As a result of this concession it appears that the amounts paid by theMcFaddin Trust in connection with the acquisition of these three properties closely approximate their value as of the date of the decedent's death, and that $75,000 was the amount which should have been credited to the decedent's account in connection with the Broussard transaction. This credit resulted in a reduction of the decedent's indebtedness to $109,415.70. Other undisputed reductions resulting from salary of $26,000 which the trust owed the decedent at the time of his death, an account payable by the trust to the decedent of $1,156.05, and the $2,100 proceeds of the sale of a lot turned over to the trust by the estate in 1940, bring the indebtedness down to $80,159.65, without taking into consideration the effect thereon of certain liabilities of the estate, consisting of judgments and notes, assumed and paid by the trust. Before considering the effect of the payment of these judgments and notes on the indebtedness of the decedent owed by *192 his estate to the McFaddin Trust, some reference should be made to the applicable law. One who voluntarily pays the debt of another does not ordinarily by such payment create a debt owing to him by the original debtor. In Hamlen v. Welch, 116 Fed. (2d) 413, the Court stated, "* * * when a taxpayer attempts to deduct as bad debts amounts which he has paid as endorser or guarantor and for which he has not been reimbursed, it must be shown that he was legally bound to pay as the voluntary assumption of obligations does not justify deductions." And in Mather v. Commissioner, 149 Fed. (2d) 393, cert. denied 326 U.S. 767, where taxpayers, as residuary legatees of a cosignor on a note, formed a corporation to liquidate the estate, and as stockholders assumed liability for the note to the extent of their distributions from the estate, the Court held they were not entitled to deduct the amount of the debt paid, and, among other things, said: "There is no * * * showing of legal obligation here. Had the corporate management of the Mather estate been unsuccessful and disastrous liquidation unavoidable, it is inescapable that the petitioners would not have *193 assumed the corporate debts which had been Mathers's. That they did assume them was the result not of a legal obligation, but because of economic recovery and successful management, which restored value to their legacies. It has been said that technical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct as a refuge from surtaxes, should not obscure basic issues in the application of the tax laws. Helvering v. Clifford, 309 U.S. 331, 334. This is not to say that the legal paraphernalia here adopted was for purpose of tax evasion or avoidance, but if form rather than essence is here to receive administrative or judicial sanction, the door is open to tax evasion in every case where an opulent testator leaves an estate subject to contingent obligations as a guarantor or surety for insolvent debtors." As shown in our findings, the McFaddin Trust included in the indebtedness of the estate of decedent $50,352.37 because of judgments against the estate which it assumed and paid and $48,290.49 because of notes of decedent and his estate which it assumed and paid, or a total of $98,642.86. Petitioners *194 now concede that the latter amount may be reduced by the $40,000 paid on the Marrs McLean note which was a first lien against the Nathan Building acquired in connection with the Broussard transaction. This leaves $58,642.86 which petitioners claim should be included in computing the amount of the indebtedness of decedent's estate to it. [3] The liabilities assumed and paid by the McFaddin Trust after the death of decedent are as follows: Note of decedent to Dorsman, as-
signed to Security State Bank, se-
cured
$ 2,500.00
Note of decedent to Texas National
Bank, secured and reduced to judg-
ment
35,725.14
Note of decedent to First National
Bank, Houston, secured and re-
duced to judgment
3,629.59
Note of decedent and judgment held
by Broussard Trust, secured by sec-
ond lien
10,500.00
Note of decedent to Management Com-
pany of Texas, secured
7,210.00
Judgment, Texas National Bank
497.64
*195 The trustees of the McFaddin Trust assumed and paid the foregoing claims against the Estate at a time when they knew the estate was insolvent, and that it did not have sufficient assets to take care of these and other claims. As beneficiaries of the trust, which held the largest claim against the estate, they stood to benefit from any action that might reduce the amount of other claims against the estate. Thus, they helped the trust and its beneficiaries by assuming and paying $10,500 for the Broussard judgment of $46,473. One of the trustees of the trust who was also an executor of the estate testified that it was necessary for the trustees to acquire these judgments against the Estate in order to protect the liens and claims which the trust Estate had against the Estate, and in order to allow the Estate to be closed. Whatever the objective in assuming these liabilities of the Estate, the action of the trustees in so doing was purely voluntary and without any legal obligation whatsoever. Such voluntary assumption of debts of the Estate did not result in increasing the indebtedness owed by the Estate to the trust and petitioners erred in treating the liabilities assumed as a part *196 of this indebtedness. Eliminating from consideration the notes and judgments assumed by the trust, the amount owed by the Estate to the trust as of February 28, 1941, was, as heretofore stated, $80,159.65. As of that date this indebtedness was recoverable only in part inasmuch as the value of the net assets of the Estate was $63,529.17 ($93,083.26 less $29,554.09). In computing the net income of the trust available for distribution to petitioners for the fiscal year ending February 28, 1941, the trust was entitled to deduct as a partial bad debt the amount of $16,630.48 ($80,159.65 less $63,529.17), the chargeoff required by the statute having been made as shown in our findings. The remaining issue concerns the penalty which the respondent seeks to impose on the Skipwith Duncan Estate for failure to file an income tax return for 1941. The evidence discloses that this taxpayer received information from the managing trustee, who was himself a lawyer and who employed a reputable accountant to care for the books of the trust, that the trust had no net income for its fiscal year ending February 28, 1941, and accordingly that there was no trust income for her to report on her 1941 return. *197 She had no other income other than her distributable share of trust income and therefore failed to file a return. Section 291, I.R.C., provides for an addition to tax for failure to file a return unless it is shown that such failure is due to reasonable cause and not due to willful neglect. Petitioner, relying upon her customary reputable source of information, had reasonable cause for her failure to file a 1941 return, and respondent erred in imposing a penalty for such failure. The Lindback Foundation, 4 T.C. 652; aff'd. per curiam 150 Fed. (2d) 986. Decision will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Camelia Blanchette McFaddin; Amizetta Northcott McFaddin; Mamie McFaddin Ward; C. E. Ward; W. P. H. McFaddin, Jr.; Rosine Blount McFaddin; James Lewis Caldwell McFaddin; and Estate of Mrs. Skipwith M. Duncan.↩
2. Petitioners agree that these amounts should be reduced by $2,100, the proceeds of the sale of a piece of property, which were turned over by the estate to the trust during the latter's fiscal year ending February 28, 1941.↩
3. The amount of $58,642.86 takes into consideration two credits, one of $639.00 being the proceeds of sale of lot covered by McLean mortgage, and the other of $780.51 being rental received from property securing Management Co. mortgage. See schedule attached to fiduciary return of McFaddin Trust for its fiscal year ending February 28, 1941, set forth in our findings.↩